931 So.2d 821 (2006)
Robert Dwayne MORRIS, Appellant,
v.
STATE of Florida, Appellee.
Robert Dwayne Morris, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-1594, SC05-227.
Supreme Court of Florida.
April 20, 2006.
Rehearing Denied June 2, 2006.
*825 John W. Jennings, Capital Collateral Regional Counsel, Middle Region, Richard Kiley and James Viggiano, Jr., Assistant CCR Counsels, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
In 2002, this Court affirmed the first-degree murder conviction and death sentence of Robert Dwayne Morris. See Morris v. State, 811 So.2d 661 (Fla.2002). Morris now appeals the trial court's order denying his motion for postconviction relief after an evidentiary hearing and also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons stated below, we affirm the trial court's order denying postconviction relief and deny the habeas petition.

FACTS AND PROCEDURAL HISTORY
Morris was convicted of first-degree murder, burglary of a dwelling with a battery or while armed, and robbery with a deadly weapon.[1] On the morning of September 2, 1994, the body of the 88-year-old victim, Violet Livingston, was found in her Lakeland apartment by her son. When the police responded to the murder scene, they found the victim lying on her bedroom floor between two beds. Her head was wrapped tightly in bed sheets, and there was blood on the walls, the furniture, and her walking cane.
The point of entry to the apartment appeared to be the kitchen window on the south side of the apartment. According to the associate medical examiner, the victim died as a result of multiple injuries, some of which were consistent with her having been beaten with her walking cane. There were also neck injuries consistent with strangulation, and wounds to her right forearm, hand, and knee, which could be classified as defensive wounds. The medical examiner determined that the victim was alive for a short period of time after the attack began.
At trial, the four main categories of evidence presented against Morris were: DNA test results linking Morris to the crime from two locations on the victim's body and from the kitchen curtain;[2] Morris's *826 fingerprints on the partially unscrewed lightbulb outside of the kitchen window of the victim's apartment; Morris's possession of various items taken from the victim's residence; and the testimony of Damion Sastre, a jailhouse informant who testified that Morris confessed to committing the murder. Morris testified in his own defense and stated that he did not kill the victim or break into her apartment. Morris denied confessing to Sastre. Morris also explained that his fingerprints were found on the lightbulb because he unscrewed it to prevent anyone from seeing him attempt to steal a bicycle from an upstairs apartment in the victim's apartment complex. Morris testified that on his way home from unsuccessfully trying to steal the bicycle, he found a brown paper sack containing several items belonging to the victim including a coin sorter, coin books, a chain necklace, and some little bags containing coins.
The jury found Morris guilty of the crimes charged. At the penalty phase, the State introduced Morris's prior felony convictions for robbery and established that Morris was on parole at the time the murder occurred. The State called a bloodstain pattern expert to testify, and also recalled the medical examiner to testify to the number and extent of the injuries sustained by the victim and that these injuries would have caused pain while the victim was conscious. In mitigation, the defense presented several of Morris's family members and friends to testify to the circumstances of Morris's childhood, including the physical and psychological abuse he suffered and witnessed. The defense also presented the testimony of Dr. Dee, a clinical psychologist and neuropsychologist. Morris did not testify at the penalty phase of his trial.
The jury recommended the death sentence by a vote of eight to four. The trial court found four aggravators,[3] one statutory mitigator,[4] eight nonstatutory mitigators that it considered collectively,[5] and numerous other nonstatutory mitigators that it considered individually and cumulatively.[6] Upon determining that the aggravating *827 factors outweighed the mitigating factors, the trial court followed the jury's recommendation and sentenced Morris to death. Morris raised five issues on direct appeal.[7] This Court concluded that there was competent, substantial evidence in this case to support Morris's convictions and affirmed Morris's convictions and death sentence. Morris thereafter filed an amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.851, in which he raised eleven claims for relief.[8] Following a Huff[9] hearing, the trial court granted an evidentiary hearing on some of the claims raised in Morris's amended rule 3.851 postconviction motion *828 and denied relief on those claims that were being raised solely to preserve the claims for federal review. After conducting an evidentiary hearing on eight of Morris's claims, the trial court issued an order denying relief. In the instant appeal, Morris challenges the trial court's denial and raises five issues related to his claims of ineffective assistance of counsel. Morris also petitions for a writ of habeas corpus, raising five claims for relief.

ANALYSIS

I. Standard of Review
In order to establish a claim of ineffective assistance of counsel, a defendant must meet two requirements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish the first prong under Strickland, the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." Id. at 688, 104 S.Ct. 2052. To establish the second prong under Strickland, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. When reviewing a trial court's ruling after an evidentiary hearing on an ineffective assistance claim, this Court gives deference to the trial court's factual findings to the extent they are supported by competent, substantial evidence, but reviews de novo the trial court's determinations of deficiency and prejudice, which are mixed questions of fact and law. See Arbelaez v. State, 898 So.2d 25, 32 (Fla.2005). Next, we address each of Morris's claims in his rule 3.851 appeal.

II. Guilt Phase Ineffective Assistance of Counsel Claims

A. Failure to Object and Move for Mistrial and Recusal of Trial Judge
In his first issue on appeal, Morris asserts that trial counsel rendered ineffective assistance during the guilt phase by failing to object to the trial court's decision to permit jurors to ask questions during trial and by failing to move for a mistrial and recusal of the trial judge. Morris contends that trial counsel should have moved for a mistrial because, according to Morris, the applicable rules of procedure and substantive law did not provide for jurors to ask questions during criminal trials. Morris also asserts as a basis for recusal that when the trial judge permitted jurors to ask questions he transcended his role as an impartial trier of fact and assumed the role of prosecutor. We conclude that counsel was not ineffective because there was no error in the procedure by which the trial court permitted jurors to ask questions during trial.
In Ferrara v. State, 101 So.2d 797 (Fla. 1958), we stated that on appropriate occasions a juror, as a trier of fact, "might be *829 completely justified in propounding a question," and that a procedure that allows jurors to ask questions during trial "should be ... controlled by the discretion of the trial judge." Id. at 801. Relying on Ferrara and other precedent, this Court has rejected a claim that the trial court violated the defendant's right to an impartial jury by allowing jurors to submit questions to witnesses during trial. See Watson v. State, 651 So.2d 1159, 1163 (Fla.1994). Under the procedure approved in Watson, the jury members would write down their question and give it to the trial judge, who would then consult with the State and the defense to determine whether the question was proper. See id. at 1163 n. 6. If it was determined that the question was proper, the trial judge would present the question to the witness for an answer. See id. We observed that the practice of questioning by jurors "has been condoned as permissible trial procedure." Id. at 1163.
The procedure we approved in Watson is nearly identical to the procedure implemented by the trial judge in this case. As in Watson, the jury in this case was instructed that all questions should be submitted in writing and that if it was determined that the questions were appropriate, they would be submitted to the witness for an answer at an appropriate time. Thus, the trial judge did not err in allowing jurors to ask questions during Morris's trial. Since the allegations of ineffectiveness in trial counsel's failure to object, move for a mistrial, and move for recusal are based on the incorrect assumption that the procedure followed by the trial judge was contrary to established law, we conclude that there was no deficient performance. Although our determination that counsel was not deficient obviates the need to address the prejudice prong under Strickland, see Waterhouse v. State, 792 So.2d 1176, 1182 (Fla.2001), we note that Morris has also failed to show that he was prejudiced by counsel's performance.[10] Morris fails to identify any specific question that was asked and how either the question or its answer undermines confidence in the outcome of his trial. Because neither prong of Strickland has been met, we affirm the trial court's denial of relief as to this claim.

B. Failure to Investigate and Prepare for Laventure's Testimony
Next, Morris asserts that trial counsel rendered ineffective assistance during the guilt phase by failing to properly investigate and prepare for witness Sherry Laventure's testimony. During opening statements, defense counsel Howard Dimmig explained that the defense's theory was that someone other than Morris committed the murder. He told the jury that Laventure would testify that she witnessed a man who "was definitely not a black man" observing the victim's apartment the day before the murder. Contrary to Dimmig's statements during opening, Laventure testified that on the day before the murder she saw a man observing *830 the victim's apartment who "wasn't white." Laventure also testified that she spoke with a bearded investigator from the public defender's office[11] and that, consistent with her testimony at trial, she told him that the person she saw was not white. Laventure further testified that Toni Maloney, who works with the public defender's office, encouraged her to testify falsely that the person she saw was not black.
Dimmig unsuccessfully attempted to refresh Laventure's recollection by referring to a previous conversation he had with her in which Laventure had stated that the person she saw did not appear to be black. However, because there was no written record of Laventure's pretrial statements, Dimmig could not impeach her testimony. Dimmig proffered his own testimony and that of Maloney that Laventure stated to them before trial that the person she saw observing the victim's apartment on the day before the murder was not black. Dimmig also presented evidence of Morris's whereabouts at the time Laventure recalled seeing someone observing the victim's apartment. To rebut Laventure's testimony that the defense encouraged her to testify falsely, a stipulation was read to the jury that neither trial counsel nor any representative of the public defender's office suggested or encouraged any witness to present false testimony.
Morris contends that had Dimmig deposed Laventure, obtained a prior written statement from Laventure, or called Barfield as a witness, counsel would have been able to impeach Laventure's testimony at trial. According to Morris, Dimmig was ineffective because Laventure's testimony was damaging to the defense and because the State exploited this testimony in closing arguments.
Trial counsel was not ineffective in deciding not to depose Laventure or obtain a prior written statement from this witness. Laventure was called as a witness to support the defense's alternate suspect theory. Dimmig testified at the evidentiary hearing that he did not depose Laventure because it was not his standard practice to depose his own witness. Dimmig stated that in over twenty years of experience as a public defender, he does not ever recall deposing a defense witness. Based on Laventure's pretrial statements to both him and Maloney, Dimmig testified that he believed he knew what Laventure's testimony would be at trial and was surprised when her testimony changed. Although Dimmig was aware that Laventure was not a willing witness, there is no evidence in the record that he knew or had reason to believe Laventure would testify at trial contrary to her pretrial statements. Under these circumstances, trial counsel was not deficient in failing to depose Laventure or obtain a prior written statement from this witness.
Also, trial counsel was not ineffective in not presenting Barfield to testify concerning his conversations with Laventure regarding the person she observed the day before the murder occurred. "[T]he failure to call witnesses can constitute ineffective assistance of counsel if the witnesses may have been able to cast doubt on the defendant's guilt, and the defendant states in his motion the witnesses' names and the substance of their testimony, and explains how the omission prejudiced the outcome of the trial." Ford v. State, 825 So.2d 358, 360-61 (Fla.2002) (quoting Jackson v. State, 711 So.2d 1371, 1372 (Fla. 4th DCA 1998)). In this case, *831 Morris failed to demonstrate the substance of Barfield's testimony or that Barfield would have been able to cast doubt on Morris's guilt, as required by Ford. See 825 So.2d at 360.
At trial, Laventure testified that she was unable to recall the name of the investigator she spoke with and would also be unable to identify the investigator if she saw him again. Both the State and the defense assumed Laventure was referring to Barfield since he was an investigator with the public defender's office and had a beard at the time he spoke to Laventure. Because it is not clear from the record if Barfield was in fact the investigator Laventure spoke with, his testimony may not have been useful in impeaching Laventure. Even assuming Barfield was the person that Laventure spoke with, there is no basis in the record to conclude that Laventure told him the person she saw was not black. Barfield was not called as a witness at the evidentiary hearing and there is no record of his conversation with Laventure. Based on these facts, Morris has failed to demonstrate that trial counsel was deficient in failing to call Barfield to testify at trial to impeach Laventure's testimony. See Spencer v. State, 842 So.2d 52, 63 (Fla.2003) (rejecting claim that counsel was ineffective for failing to call triage physician to impeach the testimony of treating physician at trial where there was no evidence or testimony from the triage physician directly contradicting the treating physician's testimony at trial).
For the same reason, Morris has failed to establish that he was prejudiced by counsel's performance. Because Barfield did not testify at the evidentiary hearing to establish what testimony he would have offered at the guilt phase of Morris's trial, we cannot determine how Barfield's testimony at trial would have affected the verdict. Cf. Davis v. State, 875 So.2d 359, 369 (Fla.2003) ("Because [the defendant] did not testify at the evidentiary hearing or otherwise establish what testimony he would have offered, we cannot conclude that our confidence in the outcome is undermined by [the defendant's] failure to testify during the penalty phase.").
Moreover, although Laventure's testimony that the person she saw observing the victim's apartment on the day before the murder occurred "wasn't white" went uncontradicted at trial, this testimony did not conclusively establish that Morris was the person she saw. Immediately following Laventure's testimony, Dimmig called Julie Woodruff to testify that Morris was at work at the time Laventure stated she saw someone observing the victim's apartment. During closing arguments, Dimmig referred to Woodruff's testimony in arguing that Laventure's testimony failed to demonstrate that Morris was the person she saw. We conclude that Morris was not prejudiced by counsel's performance because Laventure's testimony that the person she saw "wasn't white," although inconsistent with counsel's opening statements, supported the defense's theory that someone other than Morris committed the murder when this testimony is considered together with the evidence establishing Morris's whereabouts at the time Laventure witnessed someone observing the victim's apartment. Further, there was substantial evidence pointing to Morris as the perpetrator of this crime. Accordingly, we affirm the denial of relief as to this claim.

III. Penalty Phase Ineffective Assistance of Counsel Claims

A. Absence During Bench Conference
We next turn to the allegations of penalty phase ineffectiveness. Morris asserts that trial counsel was ineffective during the penalty phase in holding discussions *832 with the trial court outside of his presence and without a waiver from him.[12] "A defendant has a constitutional right to be present at all `crucial stages of his trial where his absence might frustrate the fairness of the proceedings.'" Orme v. State, 896 So.2d 725, 738 (Fla.2005) (quoting Garcia v. State, 492 So.2d 360 (Fla.1986)). However, this right "does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relative to the case is discussed." Orme, 896 So.2d at 738 (quoting United States v. Vasquez, 732 F.2d 846, 848 (11th Cir.1984)). Accordingly, this constitutional right "does not extend to bench conferences involving purely legal matters" because a defendant's presence at such conferences "would be of no assistance to counsel." Rutherford v. Moore, 774 So.2d 637, 647 (Fla.2000); see also Hardwick v. Dugger, 648 So.2d 100, 105 (Fla.1994) ("[A] defendant has no constitutional right to be present at the bench during conferences that involve purely legal matters.").
In this case, Morris cannot meet the prejudice prong of Strickland. We have repeatedly rejected claims of ineffective assistance resulting from a defendant's absence during a bench conference when the defendant has failed to show that anything was discussed at the conference that required the defendant's consultation. See, e.g., Orme, 896 So.2d at 738 (concluding that defendant failed to demonstrate prejudice from his absence because he "has not shown that anything discussed during the bench conferences required his consultation"); Vining v. State, 827 So.2d 201, 218 (Fla.2002) (determining that defendant "has not shown that any matter discussed during these bench conferences required his consultation nor has he demonstrated any prejudice from his absence"); Hardwick, 648 So.2d at 105 (concluding ineffective assistance claim was meritless because defendant "has not shown nor attempted to show that any matter was determined at these conferences that required his consultation"). In this case, even if trial counsel was deficient in holding a bench conference with the trial judge outside of Morris's presence and without a waiver by him, Morris has not established that anything was discussed during this conference that required his consultation. Nor has he established that the conference involved anything but purely legal matters to which his constitutional right to be present does not extend. Thus, we conclude that Morris has failed to demonstrate under Strickland that he was prejudiced by counsel's conduct. Accordingly, we affirm the denial of relief as to this claim.

B. Failure to Inform of Constitutional Right to Testify
Morris also asserts that trial counsel was ineffective during the penalty phase in failing to inform him of his right to testify. Morris asserts that although he testified in the guilt phase, neither the trial judge nor trial counsel explained to him *833 that he could testify in the penalty phase. Morris contends that by failing to advise him of his right to testify, trial counsel unilaterally waived Morris's right guaranteed by the Sixth Amendment to the United States Constitution.
A criminal defendant's right to testify is a fundamental right under both the Florida and United States Constitutions. See Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993). "This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." United States v. Teague, 953 F.2d 1525, 1532 (11th Cir.1992). In order to waive this right, a defendant must make a knowing, voluntary, and intelligent waiver. See Deaton, 635 So.2d at 8. However, the right to testify does not "fall within the category of fundamental rights which must be waived on the record by the defendant himself." Torres-Arboledo v. State, 524 So.2d 403, 410-11 (Fla.1988); see also Davis, 875 So.2d at 368.
This Court has determined that the trial court is not obligated to specifically inform the defendant of the right to testify at trial. See Occhicone v. State, 570 So.2d 902, 905 (Fla.1990); Torres-Arboledo, 524 So.2d at 411 n. 2. Unlike the trial court, defense counsel does have an obligation to inform the defendant of his or her right to testify. In order to establish a claim of ineffective assistance based upon trial counsel's failure to inform a defendant of the right to testify, both the deficiency and prejudice prongs of Strickland must be satisfied. See Monlyn v. State, 894 So.2d 832, 837 (Fla.2004) (requiring defendant claiming ineffective assistance from failure to advise him of right to testify to satisfy both prongs of Strickland); Oisorio v. State, 676 So.2d 1363, 1364-65 (Fla. 1996) (same).
In Teague, the Eleventh Circuit Court of Appeals elaborated on the importance of trial counsel's obligation to inform the defendant of his or her right to testify:
Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (emphasis added). Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to take the stand with the advice of competent counsel.
953 F.2d at 1533 (footnotes omitted) (parallel citations omitted). The Eleventh Circuit further explained that
[w]here the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf. In other words, by not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the Strickland test. For example, ... if defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary. Under such circumstances, defense *834 counsel has not acted "`within the range of competence demanded of attorneys in criminal cases,'" and the defendant clearly has not received reasonably effective assistance of counsel. See Strickland, 466 U.S. at 687 (quoting McMann v. Richardson, 397 U.S. 759, 770-71 (1970)).
Teague, 953 F.2d at 1534 (parallel citations omitted).
During the evidentiary hearing on this claim, trial counsel Dimmig and Howardene Garrett testified that they had pretrial discussions with Morris concerning whether he would testify at trial. Dimmig testified that during these discussions he advised Morris of his right to testify but that he was unsure whether Morris understood that this meant he had a right to testify at both the guilt and penalty phases. Garrett was unable to recall whether she discussed with Morris his right to testify at the penalty phase of his trial. Morris testified at the evidentiary hearing that although he recalled Garrett asking him whether he wanted to testify during the guilt phase, neither Garrett nor Dimmig advised him of his right to testify in both phases of his trial.
We need not determine whether there was deficient performance because we conclude that any failure to advise Morris that he had the right to testify during the penalty phase does not undermine our confidence in the death sentence and thus did not prejudice Morris. During the penalty phase, Garrett presented the testimony of twelve witnesses who collectively testified as to the circumstances of Morris's upbringing, including that Morris's mother was young when Morris was born and that she used drugs and made him steal. There was also testimony concerning the physical and psychological abuse Morris suffered and witnessed as a child. Further, these witnesses testified regarding Morris's educational background, his abuse of drugs, and the role he has played in his family's life as an adult. In addition to these witnesses, Garrett presented the testimony of Dr. Dee who testified regarding Morris's childhood and how it affected him, Morris's abuse of drugs, his diagnosis as having an ulcer as a youth, and his IQ level.
At the evidentiary hearing, Morris did not dispute the testimony of any of these witnesses or offer any other evidence beyond that presented during the penalty phase. When asked what his testimony would have been had he testified at the penalty phase, Morris responded, "I would have answered whatever questions they asked me." Morris stated that he would have also testified as to his upbringing, how he felt when his mother made him steal, and how he came to be diagnosed with ulcers. Morris further stated that he would have reaffirmed his innocence.
It is questionable whether the jury would have found Morris's testimony credible, especially as to his protestations of innocence. Garrett testified at the evidentiary hearing that she considered the fact that the jury did not believe Morris's guilt-phase testimony in determining not to call him to testify in the penalty phase. Based on Morris's diminished credibility and the fact that his testimony would have been cumulative to the extensive mitigation evidence presented at the penalty phase, we conclude that any failure by trial counsel to inform Morris of his right to testify in the penalty phase does not undermine this Court's confidence in the outcome of the trial. Accordingly, we affirm the denial of relief as to this claim.

C. Failure to Request Jury Instructions on Statutory Mitigators
As to his next issue on appeal, Morris asserts that trial counsel rendered *835 ineffective assistance during the penalty phase by failing to request that the jury be instructed on two statutory mitigating circumstances  that the murder was committed while he was under the influence of extreme mental or emotional disturbance, see § 921.141(6)(b), Fla. Stat. (1999), and that his capacity to conform his conduct to the requirements of law was substantially impaired. See § 921.141(6)(e), Fla. Stat. (1999). Morris contends that counsel's conduct prejudiced him because the trial judge found one of these statutory mitigating factors, substantially impaired capacity, based on Dr. Dee's testimony at the Spencer[13] hearing. We point out that Morris is not attacking the wisdom of trial counsel's presentation of mitigating evidence but only whether jury instructions should have been requested. To address his claim, we must determine whether there was evidence presented to the jury that would have supported the requested jury instructions.
This Court recently rejected a claim of penalty-phase ineffectiveness in counsel's failure to request instructions on the same two statutory mitigators at issue here. See Cole v. State, 841 So.2d 409 (Fla.2003). In Cole, we affirmed the trial court's conclusion that counsel was not ineffective because the psychologist did not render an opinion during the penalty phase concerning whether the two statutory mitigators applied to the murder for which the defendant was on trial. See id. at 420.
The reasoning of Cole applies here. In this case, Dr. Dee testified at trial that he met with Morris eight times and that in addition to interviewing Morris, he also interviewed several of Morris's family members. Dr. Dee testified that he reviewed all relevant records, including medical records and school records, and that he administered the revised version of the Wechsler Adult Intelligence Scale test. Based on Dr. Dee's testimony, Morris's performance on this test was 82, which fell in "the low end of the low average range at the 12th percentile." In other words, Morris scored above twelve percent of the general adult population but below approximately eighty-eight percent of this population. Dr. Dee characterized Morris's IQ level as borderline to dull normal. Dr. Dee explained that persons with this IQ level process information and make decisions slower than other individuals and that their decision-making is less useful and less accurate. Dr. Dee opined that Morris's school records suggest that Morris had attention deficit hyperactivity disorder (ADHD) as a child. However, Dr. Dee stated that although Morris was placed in educable mentally retarded classes, he was not mentally retarded as that term is used by clinicians. Dr. Dee noted that Morris was an alcoholic but had ceased this activity when he developed an ulcer in his teenage years. Finally, Dr. Dee testified that after Morris stopped drinking alcohol, he began abusing various controlled substances, including marijuana, powdered cocaine, free base cocaine, and rock cocaine.
Although Dr. Dee discussed at trial how Morris's background affected him as a child, Dr. Dee did not discuss whether Morris's IQ level, ADHD, or drug abuse affected him as an adult. More importantly, Dr. Dee did not render an opinion at trial as to whether either of these factors was likely to have affected Morris at the time he committed the murder in this case. Dr. Dee testified at trial that when he discussed Morris's decision-making and information processing skills on direct examination, he was trying to demonstrate the practical effect of Morris's IQ level on his *836 everyday life and was not rendering an opinion as to Morris's decision to commit the murder in this case or his ability to make a decision to commit a crime generally. Thus, there was no evidence presented to the jury during the penalty phase that Morris's IQ level, ADHD, or drug abuse affected his behavior before or during the time that he committed the murder. Nor was there any evidence presented to the jury at the penalty phase that Morris had any brain damage. As a result, the jury did not hear any evidence to support a finding that either statutory mitigator existed.
Rather, Dr. Dee testified at the Spencer hearing that he found evidence of frontal lobe damage, which is associated with increased impulsivity and an inability to control one's behavior. Dr. Dee stated that Morris's use of drugs tends to exacerbate his brain damage and that Morris's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired at the time the offense was committed. Dr. Dee did not testify either to the jury in the penalty phase or in the Spencer hearing concerning whether Morris was under the influence of extreme mental or emotional disturbance at the time of the offense. Because no testimony as to either statutory mitigator was presented to the jury during the penalty phase, if counsel had requested an instruction on these mitigating circumstances it likely would have been denied by the trial court. Therefore, we conclude that trial counsel was not deficient in failing to request jury instructions on statutory mitigation. See Cole, 841 So.2d at 420-21 (rejecting ineffective assistance claim of failure to request jury instruction on statutory mitigators where there was no evidence presented at trial to support the mitigators). Accordingly, we affirm the denial of relief as to this claim.

IV. Petition for Writ of Habeas Corpus

A. Constitutionality of Florida's Capital Sentencing Statute
In his first habeas claim, Morris asserts that Florida's capital sentencing scheme is unconstitutional as applied in this case under the Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Morris also asserts that appellate counsel was ineffective in failing to raise this issue on direct appeal. We conclude that Morris is not entitled to relief on this claim. We recently held that Ring does not apply retroactively to death sentences that were final when Ring was decided. See Johnson v. State, 904 So.2d 400, 412 (Fla.2005). This includes Morris's sentence. Even prior to our decision in Johnson, this Court had repeatedly relied on the presence of the prior violent felony aggravating circumstance in rejecting Ring claims. See, e.g., Smith v. State, 866 So.2d 51, 68 (Fla.2004); Davis, 875 So.2d at 374; Johnston v. State, 863 So.2d 271, 286 (Fla.2003). In this case, the trial court found as an aggravating circumstance that Morris had been previously convicted of a felony involving the use or threat of violence. Therefore, if appellate counsel had raised this issue on direct appeal, it likely would have been denied. Appellate counsel cannot be deemed ineffective for failing to raise a meritless issue. See Bryant v. State, 901 So.2d 810, 826 (Fla.2005) ("Appellate counsel is under no duty to assert a meritless claim."); Spencer, 842 So.2d at 74 ("[A]ppellate counsel will not be considered ineffective for failing to raise issues that have little or no chance of success."); Freeman v. State, 761 So.2d 1055, 1070 (Fla.2000) ("Appellate counsel cannot be *837 ineffective for failing to raise an issue which is without merit.").[14]

B. Cumulative Effect of Procedural and Substantive Errors
Morris also asserts that the cumulative effect of the procedural and substantive errors deprived him of a fundamentally fair trial. Based on our conclusion that Morris has failed to establish that any of the claims raised on appeal have merit or are not procedurally barred, we determine that Morris was not deprived of a fundamentally fair trial. See Melendez v. State, 718 So.2d 746, 749 (Fla.1998) (concluding that where claims were either meritless or procedurally barred there was no cumulative effect to consider); Johnson v. Singletary, 695 So.2d 263, 267 (Fla.1996) ("[B]ecause all issues which were not barred were meritless, we can find no cumulative error.").[15]

CONCLUSION
For the reasons explained above, we affirm the trial court's order denying the motion for postconviction relief, and we deny the habeas petition.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs with an opinion, in which ANSTEAD, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurring.
I concur in the majority opinion affirming the denial of postconviction relief and denying Morris's habeas petition. I write separately to encourage trial courts to obtain an on-the-record waiver of a defendant's constitutional right to testify at trial both in the guilt and penalty phases. The claim of ineffective assistance of counsel resulting from counsel's alleged failure to inform the defendant of his or her right to testify has been raised in many cases over the years. See, e.g., Peterka v. State, 890 So.2d 219, 235 (Fla.2004), cert. denied, ___ U.S. ___, 125 S.Ct. 2911, 162 L.Ed.2d 301 *838 (2005); Davis v. State, 875 So.2d 359, 368-69 (Fla.2003); Fennie v. State, 855 So.2d 597, 601 n. 1 & 601 n. 3 (Fla.2003); Lawrence v. State, 831 So.2d 121, 131-32 (Fla. 2002); Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993); Torres-Arboledo v. State, 524 So.2d 403, 409-11 (Fla.1988). Although this Court has never mandated that trial courts conduct an on-the-record waiver, as we noted in Torres-Arboledo, in many cases this will "avoid post-conviction claims of ineffective assistance of counsel based on allegations that counsel failed to adequately explain the right or actively refused to allow the defendant to take the stand." 524 So.2d at 411 n. 2.
ANSTEAD, CANTERO, and BELL, JJ., concur.
NOTES
[1] The facts are taken from Morris's direct appeal. See Morris, 811 So.2d at 663-64.
[2] The State's population geneticist testified that the frequency of the DNA pattern in the African-American population was 1 in 7.1 million. Morris presented his own population geneticist who testified that this DNA frequency in the African-American population was 1 in 2.2 million.
[3] The aggravating factors found by the trial court were: (1) the crime was committed while Morris was on parole from a previous felony (moderate weight); (2) Morris was previously convicted of a felony involving the use or threat of violence (moderate weight); (3) the crime was committed for pecuniary gain (great weight); and (4) the crime was especially heinous, atrocious, or cruel (HAC) (great weight).
[4] The trial court found as a statutory mitigator that Morris had a substantially impaired capacity to conform his conduct to the requirements of law (moderate weight).
[5] These nonstatutory mitigators were: (1) Morris was born to a teenaged, unmarried mother; (2) Morris was physically and emotionally abused as a child; (3) Morris suffered from neglect and physical deprivation as a child; (4) Morris's mother was a drug and alcohol abuser when he was a child; (5) Morris grew up in extreme poverty; (6) Morris witnessed the physical and sexual abuse of his mother and sisters; (7) Morris's father was absent for most of Morris's life; and (8) Morris's mother was arrested and had a criminal record while he was growing up (great weight collectively).
[6] These nonstatutory mitigators were: (1) Morris had a borderline IQ (little weight); (2) Morris had learning disabilities as a child (little weight); (3) Morris developed ulcers at a young age, reflecting extreme stress (little weight); (4) Morris used alcohol and drugs at a young age and developed life-long addiction problems (little weight); (5) Morris obtained a high school diploma despite obstacles (slight weight); (6) Morris had loving protective relationships with family including his daughter (some weight); (7) Morris adapts well to prison life (little weight); (8) Morris can continue to support, encourage, and nurture his family while incarcerated (some weight); (9) a life sentence is sufficient (little weight); and (10) Morris's courtroom demeanor was superb (some weight).
[7] Morris raised the following claims: (1) the trial court erred in excluding the proffered testimony of defense witness Toni Maloney; (2) Morris should receive a new trial due to improper contacts between members of the jury and an excused venireperson who attended the trial as a spectator; (3) the trial court erred in finding that Morris's history of drug abuse was not mitigating; (4) the trial court erred in refusing to instruct the jury on specific nonstatutory mitigating circumstances; and (5) the death sentence is disproportionate.
[8] These claims were: (I) Morris was deprived of his right to a reliable adversarial testing due to ineffective assistance of counsel at the guilt phase of his capital trial in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution and his corresponding rights under the Florida Constitution; (I)(A) trial counsel was ineffective in failing to object and move for a mistrial and subsequent recusal of the trial judge during the guilt phase of the trial; (I)(B) trial counsel was ineffective in failing to properly investigate and prepare in the guilt phase of the trial; (II) Morris is educable mentally retarded and his execution would violate section 921.137(2), Florida Statutes (2002); (III) Morris was deprived of his rights to due process and equal protection under the Fourteenth Amendment, as well as his rights under the Fifth, Sixth, and Eighth Amendments because the mental health expert who evaluated him failed to conduct a professionally competent and appropriate evaluation, and Morris's right to a fair, individualized, and reliable capital sentencing determination was denied because trial counsel rendered ineffective assistance; (IV) Morris was deprived of his rights to due process and equal protection under the Fourteenth Amendment, as well as his rights under the Fifth, Sixth, and Eighth Amendments because trial counsel failed to provide Morris's mental health expert with adequate background information to permit a meaningful evaluation of Morris for the presence of mitigation; (V) Florida's death sentencing statute as applied is unconstitutional; (VI) Morris was deprived of his right to a fair penalty phase trial in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution and his corresponding rights under the Florida Constitution, and trial counsel was ineffective in holding discussions with the court outside the presence of Morris without a personal waiver; (VII) trial counsel was ineffective for failing to call Morris to testify at the penalty phase; (VIII) section 921.141(5), Florida Statutes (1997), is facially vague and overbroad in violation of the Eighth and Fourteenth Amendments; (VIII)(A) the jury instruction on the aggravator of murder committed during the course of a robbery is unconstitutional on its face and as applied; (VIII)(B) the trial court's instructions to the jury unconstitutionally diluted its sense of responsibility in determining the proper sentence; (IX) Morris was denied the effective assistance of counsel at the sentencing phase of the trial in violation of the Sixth, Eighth, and Fourteenth Amendments because trial counsel failed to request that the court instruct the jury on statutory mitigators where evidence was presented on statutory mitigation in the sentencing phase of Morris's trial; (X) Morris's Eighth Amendment right against cruel and unusual punishment will be violated because Morris may be incompetent at the time of execution; and (XI) Morris's trial was fraught with procedural and substantive errors which cannot be harmless when viewed as a whole.
[9] Huff v. State, 622 So.2d 982 (Fla.1993).
[10] Morris cites United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), in support of his argument that he is not required to show that he was prejudiced by counsel's conduct in this case. Morris's reliance on Cronic is misplaced. In Cronic, the United States Supreme Court identified several circumstances for which a presumption of prejudice from denial of counsel under the Sixth Amendment is appropriate. See id. at 659-61 & 659 n. 25, 104 S.Ct. 2039. The Supreme Court explained that apart from these circumstances, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Id. at 659 n. 26, 104 S.Ct. 2039. The facts of this case do not fall within the circumstances delineated in Cronic. Therefore, Morris must also establish prejudice under Strickland.
[11] Laventure testified that she could not remember this investigator's name but that she recalls he had a beard. The State and defense counsel assumed that Laventure was referring to an investigator named Brad Barfield.
[12] Morris also asserts that his involuntary absence from the courtroom during these discussions violated his constitutional right to be present during the bench conference. This substantive claim is procedurally barred because it was not raised on direct appeal. See Phillips v. State, 894 So.2d 28, 35 & n. 6 (Fla.2004) (concluding that defendant's claim that his absence from an unrecorded bench conference violated his constitutional right to be present at trial was procedurally barred because it was not raised on direct appeal); Vining v. State, 827 So.2d 201, 217 (Fla.2002) (determining that "substantive claims relating to Vining's absence [during critical stages of trial] are procedurally barred as they should have been raised either at trial or on direct appeal").
[13] Spencer v. State, 615 So.2d 688 (Fla.1993).
[14] We also deny relief on Morris's second and third habeas claims. These claims are either procedurally barred or without merit. On direct appeal, this Court considered and rejected Morris's second claim that the trial court erred in denying his requested special jury instruction on nonstatutory mitigation. See Morris, 811 So.2d at 667-68. Thus, Morris is barred from relitigating this claim. See Breedlove v. Singletary, 595 So.2d 8, 10 (Fla. 1992) ("Habeas corpus is not a second appeal and cannot be used to litigate or relitigate issues which could have been ... or were raised on direct appeal."). In his third claim, Morris asserts that the jury instruction on the aggravator of murder committed during the course of an enumerated felony, and the instruction on the role of the jury are unconstitutional. Because trial counsel did not object to these instructions, this claim is procedurally barred. See Johnson v. State, 903 So.2d 888, 899 (Fla.) ("Because no objection was raised at trial, the claim is procedurally barred."), cert. denied, ___ U.S. ___, 126 S.Ct. 802, 163 L.Ed.2d 632 (2005). Even if not barred, this claim is without merit because this Court has previously rejected it on appeal. See Blanco v. State, 706 So.2d 7, 11 (Fla.1997) (rejecting claim that the murder in the course of a felony aggravating circumstance is unconstitutional); Melendez v. State, 612 So.2d 1366, 1369 (Fla.1992) (rejecting claim that standard instruction on the role of the jury diluted the jury's sense of responsibility).
[15] We also deny relief on Morris's fifth habeas claim, that his Eighth Amendment rights will be violated because he may be incompetent at the time of execution. This claim is not ripe for review as no death warrant has been signed. See Griffin v. State, 866 So.2d 1, 21-22 (Fla.2003) ("While Griffin is under a death sentence, no death warrant has been signed and his execution is not imminent. Thus, the issue of Griffin's sanity for execution is not ripe ....").